IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

STATE OF ARIZONA, *Appellee*,

*v.*

CARLOS ANDRES MACIEL, *Appellant*.

No. 1 CA-CR 14-0243
FILED 9-10-2015

Appeal from the Superior Court in Yuma County
No. S1400CR201300422
The Honorable David M. Haws, Judge

**AFFIRMED**

COUNSEL

Arizona Attorney General's Office, Phoenix
By Michael O'Toole
*Counsel for Appellee*

Yuma County Public Defender's Office, Yuma
By Edward F. McGee
*Counsel for Appellant*

**OPINION**

Judge Kenton D. Jones delivered the opinion of the Court, in which Chief
Judge Michael J. Brown joined. Judge Peter B. Swann dissented.

**J O N E S**, Judge:

¶1        Carlos Maciel appeals his conviction and sentence on one count of burglary in the third degree. Maciel contends the trial court erred in denying his motions: (1) to suppress his statements to police, and (2) for judgment of acquittal on the basis that the State failed to establish the *corpus delicti*. For reasons set forth below, we affirm.

## FACTS AND PROCEDURAL HISTORY

¶2        On April 10, 2013, a motorist observed Maciel seated next to a vacant building with a broken window. The motorist noticed the board that previously covered the broken window had been removed and, aware of prior break-ins at the building, called the police. An officer was dispatched to what was reported as a possible burglary.

¶3        Upon arrival, and after speaking with the motorist, the officer contacted Maciel, who was still seated a few feet from the broken window, obtained his identification, and conducted a pat-down search for weapons. Finding no weapons on or outstanding warrants for Maciel, the officer asked him "what he was doing" and if he knew "how the board got removed from the window." Maciel replied that he was just sitting down and denied any knowledge of the board being removed from the window. The officer asked Maciel to sit in his patrol vehicle until another officer arrived at the scene. A second officer arrived within minutes, and Maciel was then asked to sit on the curb next to the building while the second officer stood nearby. Maciel complied with the officer's requests.

¶4        The pastor of the church on the property adjoining the vacant building arrived and advised that the board had been in place over the broken window three days earlier. With that additional information, the first officer again asked Maciel about the window. Without further prompting, Maciel admitted removing the board the day before and entering the building to look for money. He stated that another male told him to go inside, but Maciel alone had entered the building. Maciel was then placed under arrest, handcuffed, and placed in the patrol vehicle.

¶5        Two officers then entered the building to search for evidence of a burglary or persons possibly still in the building. Shoe prints inside did not match the shoes worn by Maciel at the time of his arrest, and there was no other evidence of entry. The pastor was unable to identify anything missing or stolen.

¶6        Then, the first officer went back to the patrol vehicle, advised Maciel of his rights pursuant to *Miranda v. Arizona*, 384 U.S. 436 (1966), and again asked him about going into the building. Maciel again reported he removed the board and entered the building. Maciel stated he pulled the board off "by hand," and when he was advised the shoe prints inside did not match his shoes, Maciel stated "he hadn't gone in very far." The entire investigation lasted approximately one hour.

¶7        Following a jury trial, Maciel was convicted of one count of burglary in the third degree. The trial court suspended the sentence, placed Maciel on intensive probation for thirty-six months, and ordered him to serve thirty days in jail as a condition of probation. Maciel timely appealed. We have jurisdiction pursuant to Arizona Revised Statutes (A.R.S.) sections 12-120.21(A)(1),[1] 13-4031, and -4033(A)(1).

## DISCUSSION

### I.    Motion to Suppress

¶8        Before trial, Maciel moved to suppress his statements to the police, arguing the officer engaged in an improper "two-step" interrogation process by deliberately soliciting incriminating statements from him while he was in custody but prior to providing *Miranda* warnings, and then re-soliciting those same statements after he was arrested, in violation of *Missouri v. Seibert*, 542 U.S. 600, 604 (2004). Following an evidentiary hearing, the trial court determined Maciel's statements were voluntary. It further found Maciel's pre-*Miranda* statements were not obtained during a custodial interrogation, but rather resulted from permissible "on-the-scene questioning."

¶9        In doing so, the trial court specifically rejected Maciel's two-step *Miranda* violation argument, finding the questioning during the on-scene investigation did not constitute a "first *Miranda* violation," and there was no evidence the officer intended to engage in improper or coercive tactics. The court reasoned: "The second questioning [at the curb] had come after [the officer] knew somewhat more about the circumstances," had "some questions" about the truthfulness of Maciel's initial statements, and was "simply following up." The court noted favorably that "[a]s soon as [Maciel] made statements that gave the officer probable cause for arrest, he ceased questioning, and then before he reinitiated questioning, he advised

---

[1]       Absent material revisions from the relevant date, we cite a statute's current version.

[Maciel] of his *Miranda* rights." Thus, the court concluded all of Maciel's statements were admissible.

¶10 Maciel argues on appeal that the trial court's ruling is erroneous, and his statements were both involuntary and obtained in violation of *Miranda*. We review the trial court's decision to admit statements of a defendant for an abuse of discretion. *State v. Ellison*, 213 Ariz. 116, 126, ¶ 25 (2006) (citing *State v. Jones*, 203 Ariz. 1, 5, ¶ 8 (2002)). In doing so, we consider only the evidence presented at the suppression hearing and view it in the light most favorable to upholding the trial court's ruling. *Id.* (citing *State v. Hyde*, 186 Ariz. 252, 265 (1996)). We defer to the trial court's factual findings, but review its legal conclusions *de novo*. *State v. Box*, 205 Ariz. 492, 495, ¶ 7 (App. 2003) (citing *State v. Valle*, 196 Ariz. 324, 326, ¶ 6 (App. 2000)).

### A. Maciel Was Not in Custody During the Officer's Initial Inquiry or While Waiting at the Curb.

¶11 Before police engage in "custodial interrogation," or "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way," the suspect must be given a *Miranda* warning. *State v. Kennedy*, 116 Ariz. 566, 568-69 (App. 1977) (citing *Miranda*, 384 U.S. at 444, and *State v. Bainch*, 109 Ariz. 77, 79 (1973)). While the circumstances of each case will determine whether a suspect is in custody for the purpose of triggering *Miranda* warnings, being "in custody" is an objective condition with "the ultimate inquiry [being] simply whether there is a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest." *State v. Cruz-Mata*, 138 Ariz. 370, 372-73 (1983) (quoting *California v. Beheler*, 463 U.S. 1121, 1125 (1983)); *see also Kennedy*, 116 Ariz. at 569 ("'The vital point is whether, examining all the circumstances, the defendant was deprived of his freedom of action in any significant manner, and the defendant was aware of such restraint.'") (quoting *Bainch*, 109 Ariz. at 79).

¶12 When determining whether questioning is actually custodial, there is no one factor that controls whether a person is in custody; rather, we consider objective factors, the most important being: (1) the site of the interrogation; (2) whether objective indicia of arrest are present; and (3) the length and form of the interrogation. *Cruz-Mata*, 138 Ariz. at 373 (approving three of four factors identified in *Kennedy*). In our consideration of these factors, we bear in mind the purpose of *Miranda* warnings: to curtail involuntary admissions elicited through mental or physical intimidation.

*See Kennedy*, 116 Ariz. at 569 (citing *State v. Tellez*, 6 Ariz. App. 251, 255 (1967)).

¶13        Maciel first disputes the trial court's findings that he was not in custody either when he was asked to sit in the patrol vehicle or when he was thereafter asked to sit at the curb. However, the transcript of the hearing demonstrates the court fully considered the circumstances before concluding that Maciel was not in custody prior to his formal arrest. The record supports this conclusion.

¶14        At the suppression hearing, the officer testified he was initially the only officer on the scene and had no idea whether Maciel was involved in any crime or whether there was anyone inside the building. He therefore asked Maciel to sit in the patrol vehicle for "both of our safety," explaining they both would be in danger if an armed person emerged from the building. Maciel was not handcuffed, was not escorted to or placed in the patrol vehicle by the officer, and was not under arrest. The officer did not question Maciel while he was in the patrol vehicle, but simply "watch[ed] the building just to see if anyone came out." Within minutes, another officer arrived, and the first officer asked Maciel to exit the patrol vehicle and sit on the curb next to the building while the other officer stood nearby.

¶15        In *Cruz-Mata*, our supreme court affirmed a trial court's ruling that a defendant was not in custody where he agreed to accompany an officer to the police station for questioning, was transported in a patrol vehicle, and was questioned for approximately ninety minutes before confessing. 138 Ariz. at 373. Although a police station could be considered a "coercive environment," the court found no other objective indicia of arrest: "Defendant was not subjected to the booking process, nor were physical restraints such as handcuffs used, nor was a weapon drawn." *Id.* The court further noted "no force, threat[] or other compulsion" was used to elicit responses. *Id*. This analysis compels a similar conclusion here.

¶16        The trial court found the officer's initial questions to Maciel were not an interrogation but rather, reasonable "on-the-scene questioning" to assess the situation. *See State v. Morse*, 127 Ariz. 25, 28 (1980) (excluding general, on-the-scene questioning during a criminal investigation from the definition of custodial interrogation). The record is clear that Maciel was near the broken window when the motorist made his report and remained there when the officer arrived. As the only law enforcement officer at the scene of an alleged burglary, it was an appropriate first step for the officer to ask Maciel what he knew about the

removal of the board, just as the officer questioned the pastor as to the issue upon his arrival.

¶17        Once the officer observed evidence of a potential illegal entry, the building and the surrounding area became the scene of a criminal investigation over which he was in control. Rather than direct Maciel to leave the crime scene or allow him to continue to sit by the open window when an intruder might still be inside, the officer asked Maciel to sit in the patrol vehicle where the officer believed he would be safer. The trial court accepted the officer's testimony, and we defer to its assessment of witness credibility, especially where, as here, none of the objective indicia of arrest were present. *See Pima Cnty. Juv. Action No. 63212-2*, 129 Ariz. 371, 375 (1981) ("The deference which appellate courts accord the trier of fact, whether judge or jury, to make determinations based on assessments of the credibility of witnesses is elementary.") (citations omitted). Moreover, the record supports the determination that safety was the officer's concern.[2] Following his direction to Maciel, the officer did not, himself, breach the building but simply watched and waited to enter until another officer arrived, asking no further questions of Maciel throughout that period. The court implicitly found Maciel was not in custody while in the patrol vehicle, and the conclusion is supported by the record. *See State v. Zamora*, 220 Ariz. 63, 67, ¶ 7 (App. 2009) (noting we will infer findings necessary to affirm the trial court as long as there is no conflict with any express findings) (citing *State v. Ossana*, 199 Ariz. 459, 461, ¶ 8 (App. 2001), and *Coronado Co. v. Jacome's Dep't Store, Inc.*, 129 Ariz. 137, 139 (App. 1981)).

¶18        Turning to the curb-side questioning, the record shows the trial court fully considered the cumulative effect of Maciel's interactions with the police before considering whether he was in custody while sitting at the curb. The court began its analysis by noting Maciel had been in the patrol vehicle for safety reasons and had not been handcuffed, reiterating its conclusion that Maciel was not then in custody. After considering anew the relevant "indicia of custody," the court then determined Maciel was likewise not in custody while sitting at the curb. Again, Maciel was not handcuffed or told he was under arrest, no weapons were drawn, no physical force was used, and there was nothing coercive or inherently threatening about the curb itself. There is nothing in the record to suggest

---

[2]        Contrary to the concerns expressed in the dissent, *infra* ¶ 44, the officer did articulate a potential danger in allowing Maciel to remain seated by the uncovered window, noting: "If someone had emerged from the broken window and I had to contact them and if they were armed, we might have . . . both been in danger in the close proximity to the window."

the second officer was directed to treat Maciel as if he were in custody or that the second officer believed Maciel to be in custody. Nor can the testimony that Maciel "sat by the building with [the second officer]," viewed in the light most favorable to upholding the conviction, reasonably support the dissent's statements, *infra* ¶¶ 36, 44, that the second officer "stood guard" or "watched over" Maciel while he sat on the curb. Additionally, the "length and form of the interrogation," consisting of "two or three questions" that lasted "a few moments, at most," did not objectively indicate Maciel was in custody. The court thus concluded, "[g]iven all of those circumstances . . . the questioning that took place in the second part of the interrogation after [Maciel] had been taken out of the police car and seated on the curb was not a custodial interrogation."

¶19 Again, the record reflects the area remained an active crime scene. It was reasonable for the officer to control the movement of any persons within the area when he did not and could not have known who or what danger may have been inside. Having Maciel remain at the curb with an officer who could prevent him from wandering around the crime scene provided a degree of safety to everyone. *Cf. State v. Johnson*, 220 Ariz. 551, 557 (App. 2009) (noting law enforcement officer "must be able to control the scene of a traffic stop to protect the driver, passengers, and the public in general") (citing *Arizona v. Johnson*, 555 U.S. 323, 333 (2009)).

¶20 Moreover, the curb-side questioning occurred only after the officer was advised by the pastor that the board had been on the window three days earlier. It was not improper for the officer, armed with additional information, to return to Maciel and attempt to further narrow the timeframe during which the board may have been removed and the crime committed. Maciel then, without further prompting, admitted removing the board. With that, the questioning of Maciel ceased and he was placed under arrest. In the absence of any testimony or evidence that Maciel was improperly compelled to answer the officer's questions, the trial court's determination that Maciel was not in custody at the time the first officer asked him for additional information is supported by the evidence.[3]

---

[3] Even if the record could be reasonably read to conclude the officer "was also encouraging a third party [the pastor] to pursue a speculative criminal complaint against the individual who was the focus of his care [Maciel]," *infra* ¶ 44, it would be irrelevant to a determination of whether an objectively reasonable defendant would have believed he was "in custody" at the time of questioning.

**B.   The Officer Did Not Engage in a Two-Step Interrogation Process Under *Seibert* or *Elstad*.**

¶21    The trial court next considered Maciel's argument that the officer engaged in a two-step interrogation process prohibited by *Seibert* — the first occurring at the curb, and the second following Maciel's formal arrest.  In *Seibert*, the U.S. Supreme Court examined the propriety of a police protocol whereby officers were instructed not to give *Miranda* warnings until their interrogation produced a confession that, although admittedly inadmissible, was then used to coerce "the suspect to cover the same ground[] a second time" after *Miranda* warnings were given.  542 U.S. at 604.  A plurality of the Supreme Court held: "The impression that the further questioning was a mere continuation of the earlier questions and responses" creates a coercive environment, depriving a reasonable person of a true sense of choice to remain silent.  *Id.* at 616-17.  Therefore, post-warning statements obtained in such a fashion are inadmissible.  *Id.*

¶22    We find no merit in Maciel's argument.  First, having concluded there was no "first *Miranda* violation" because Maciel was not in custody during the curb-side questioning, there cannot, by definition, have been a second *Miranda* violation that would implicate the two-step interrogation process discussed in *Seibert*.  *See supra* ¶¶ 18-20.

¶23    Second, even assuming Maciel was in custody during the curb-side questioning, no evidence was presented to suggest either the police department generally, or the officer individually, engaged in any deliberate tactic to withhold *Miranda* warnings, or that the officer used pre-*Miranda* statements to pressure Maciel during the post-*Miranda* questioning.  To the contrary, the trial court specifically determined "there was no malic[e] or intent by the officer trying to subvert *Miranda* by questioning without *Miranda* and then later going back to questioning with *Miranda*."  This finding is supported by the record.  Indeed, it is only with the benefit of hindsight — a luxury not available to law enforcement officers attempting to conduct a thorough investigation, nor instructive in our analysis — that the officer could have known Maciel would volunteer incriminating statements.

¶24    Finally, because no evidence exists here of the deliberate use of a two-step procedure as addressed in *Seibert*, the proper test is that set forth in *Oregon v. Elstad*, 470 U.S. 298 (1985).  *Zamora*, 220 Ariz. at 70, ¶ 18.  Under *Elstad*, the trial court must determine: (1) whether the initial, pre-*Miranda* warning statements were coerced, and if so, (2) whether "the taint from such coercion has not dissipated through the passing of time or a

change in circumstances." *Elstad*, 470 U.S. at 314. If the initial statements were coerced, and the coercion did not dissipate through the passing of time or change in circumstances, all of the statements must be suppressed. *Id.* However, "a suspect who has once responded to unwarned yet uncoercive questioning is not thereby disabled from waiving his rights and confessing after he has been given the requisite *Miranda* warnings." *Id.* at 318. Therefore, if uncoerced statements are made pre-*Miranda*, they are nonetheless admissible if voluntarily repeated post-*Miranda*. *Id.*

¶25        As noted above, reasonable evidence supports the trial court's finding that Maciel's statements at the curb were not coerced. *See supra* ¶¶ 18-20. After placing Maciel in custody and following additional investigation, the officer properly provided *Miranda* warnings before questioning Maciel further. Maciel then voluntarily chose to speak further with law enforcement and waived his *Miranda* rights. We find no error in the admission of Maciel's subsequent statements.

¶26        Giving due deference to the trial court's factual findings, we find no abuse of discretion in the admission of Maciel's statements to law enforcement.

## II.        Denial of Motion for Judgment of Acquittal

¶27        Maciel next argues the trial court erred in denying his motion for judgment of acquittal, alleging no *corpus delicti* or physical evidence supports his admission that he removed the board and entered the building. He essentially asserts insufficient evidence was presented to support his conviction because there is no proof that anything was actually missing from the building or that he had an intent to commit a theft. We review the denial of a motion for judgment of acquittal based upon the *corpus deliciti* doctrine for an abuse of discretion. *State v. Jones ex rel. Cnty. of Maricopa*, 198 Ariz. 18, 23, ¶ 13 (App. 2000) (citing *State v. Gerlaugh*, 134 Ariz. 164, 170 (1982), and *Adolfson v. United States*, 159 F.2d 883, 888 (9th Cir. 1947)).

¶28        "A defendant may not be convicted of a crime based on an uncorroborated confession without independent proof of the *corpus delicti*, or the 'body of the crime.'"[4] *State v. Morgan*, 204 Ariz. 166, 170, ¶ 15 (App.

---

[4]        The State urges us to hold the *corpus delicti* doctrine is no longer viable in Arizona. However, our supreme court still recognizes the applicability of the doctrine, *see State v. Morris*, 215 Ariz. 324, 333, ¶¶ 33-36

2002) (citing *State v. Gillies*, 135 Ariz. 500, 506 (1983), and *Jones*, 198 Ariz. at 2, ¶ 12). However, under Arizona's "corroborative approach," before incriminating statements may be considered, the State's proof need establish only a reasonable inference the crime was actually committed. *Morris*, 215 Ariz. at 333, ¶ 34 (citing *State v. Hall*, 204 Ariz. 442, 453, ¶ 43 (2003)). Such evidence may be circumstantial, *id.* (citing *Hall*, 204 Ariz. at 453, ¶ 43), and "need not be of the quantum of proof beyond a reasonable doubt," *Jones,* 198 Ariz. at 22, ¶ 12 (citing *Gerlaugh*, 134 Ariz. at 170).

¶**29** Applying the corroborative approach, the trial court properly found the State had presented "sufficient corroboration of the admission[s] to get past the *corpus delicti* issue." In support of its finding, the court referenced evidence that Maciel was seen "right next to the window with the board taken off." Additionally, there were shoe prints inside, providing evidence that entry was made into the building. Although the shoe prints did not match the shoes Maciel was wearing when he was arrested, the court noted Maciel had stated he went in the day before, when he could have been wearing different shoes. Additional circumstantial evidence also creates a reasonable inference a burglary was committed around the time Maciel was observed near the un-boarded window, including: (1) testimony that the pastor had seen the board in place on the window when he was at the church three days prior, indicating the board was only recently removed; (2) physical evidence that the board had been nailed over the window and required active efforts to physically detach; (3) testimony that the building was used primarily for storage purposes and access through the window led to the basement storage area; and (4) evidence that the maintenance man who walked the property twice a week had not reported seeing anything "out of place" before the incident.

¶**30** The State's evidence, while circumstantial, provided a reasonable inference a burglary had occurred and corroborated Maciel's voluntary statements. Therefore, we find no abuse of discretion in the trial court's denial of Maciel's motion for judgment of acquittal.

## CONCLUSION

¶**31** For the foregoing reasons, we affirm Maciel's conviction and sentence.

---

(2007), and we have no authority to overrule its direction, *State v. Foster*, 199 Ariz. 39, 41 n.1, ¶ 9 (App. 2000) (citing *Myers v. Reeb*, 190 Ariz. 341, 342 (App. 1997)).

**S W A N N**, Judge, dissenting:

¶32        I respectfully dissent.  The officers in this case subjected Maciel to custodial interrogation and did not issue *Miranda* warnings until after he had made incriminating statements.  The statements should have been suppressed, and the conviction should be reversed and remanded.

## FACTUAL BACKGROUND

¶33        At the suppression hearing, Officer Huntley testified that once he arrived at the scene, he noticed Maciel sitting on the ground outside the church with a shopping cart containing personal items.  Huntley contacted Maciel and asked him what he was doing.  Maciel replied that he was just sitting next to the building.  Huntley then asked Maciel about the window and Maciel stated that it was already damaged when he arrived at the church.  Maciel was homeless, and as a part of his initial investigation, Huntley asked him questions about the shopping cart containing his personal possessions.  To this point, I agree that there had been no custodial interrogation -- the Supreme Court has "explicitly excluded general on-the-scene questioning for the purpose of investigating crime from its definition of 'custodial interrogation.'"  *Morse*, 127 Ariz. at 28.

¶34        Huntley then asked for Maciel's identification and ran a warrants check, which came back clear, and then, with Maciel's consent, conducted a pat-down search, which produced no weapons or other evidence of contraband.  Huntley stated that he then had Maciel sit in the backseat of his patrol vehicle "[b]ecause [he] didn't know if [Maciel] was involved at that point in a crime and [he] didn't know if there was anyone inside the building."

¶35        Whether one believes Huntley's testimony or not, the act of placing an individual (especially one whose identification and warrant status raised no suspicions) in the back of a police car is inherently inconsistent with the reasonable freedom of movement that citizens normally have a right to expect.[5]  I think it fair to say that most people who

---

[5]        I find *Cruz-Mata* distinguishable in this regard.  In that case, the defendant affirmatively accepted an invitation to travel to a police station with an officer in the front seat of a police car. 138 Ariz. at 373.  Here, Maciel was placed in the back of a police car.  The only "agreement" to enter the back of the car in this record was Maciel's failure to object.  The purpose of Maciel's presence in the police car was not mere transportation as in *Cruz-Mata* -- it was confinement.

walk by, sit or stand near a building missing a board over its window do not reasonably expect to be confined in a police vehicle merely because the police "do not know" if they have been involved in a crime. And I daresay that many citizens routinely find themselves in the proximity of buildings with missing windows, yet they would reasonably believe themselves to be in custody if this simple fact landed them in the back of a police car.

¶36 When Ofc. Franklin arrived on the scene, Huntley "asked Mr. Maciel to exit the patrol vehicle and sit down on the curb next to the building" with Franklin watching over him. Ofc. Sanchez then arrived and she and Huntley conducted an initial search of the building while Franklin stood guard over Maciel. Though no longer within the confines of a police cruiser, Maciel was forced to wait for approximately an hour, under guard, while the police conducted an investigation that did not reasonably concern him. This too was inconsistent with an individual's reasonable freedom of movement.

¶37 In these circumstances, I cannot agree with the majority that Maciel was not "deprived of his freedom of action in any significant way." *Kennedy*, 116 Ariz. at 569. When law enforcement officers place an individual in a police vehicle, then ask him to remain in a specific location while they stand guard, any remaining "freedom of action" is a pure legal fiction. Though there had not been a formal arrest at this point, neither was Maciel free to leave. He was, by any reasonable measure, in custody while the officers sought grounds to arrest him.

¶38 The pastor of the church then arrived and told Huntley that the window had been boarded up a few days earlier. Huntley asked the pastor if he would be willing to pursue a complaint against Maciel if Huntley found out that Maciel was the individual who had removed the board from the window. Huntley stated that he asked this question because if the pastor was not willing to be the victim of a crime, there was "really not any reason to detain or to do any further investigation."

¶39 Huntley then questioned Maciel again about the window and Maciel replied that "he pulled [the board] off because he went in to find some money." Huntley placed Maciel under arrest, handcuffed him, and placed him in the back of his patrol car for the second time. Huntley cleared the building and looked for shoe impressions. When Huntley went back to his vehicle to speak with Maciel, he advised Maciel of his *Miranda* rights and continued to question him. Maciel admitted for the second time that he had pulled the board off the window and entered the building.

## ANALYSIS

**¶40**      The court denied Maciel's motion to suppress, citing three factors.  The first factor was the site of the interrogation, which the court did not find was indicative of custody because the questioning took place at the church, and although Maciel was placed in a police car for a time, he was later "allowed to sit on the curb."  The second factor was whether other objective indicia of arrest were present.  The court found that Maciel was not handcuffed and was not told he was under arrest, and that therefore objective indicia of arrest were not present.  And third, the court found the length and form of interrogation to be brief -- despite the fact that Maciel was detained for at least an hour.  The court also stated that because Huntley testified that he did not believe Maciel was in custody when he re-questioned him, "the questioning that took place in the second part of the interrogation . . . was not a custodial interrogation."

**¶41**      "Whether a defendant is in custody such that *Miranda* warnings are required to be given is determined by an objective test of whether a reasonable person would feel deprived of his freedom in a significant way."  *State v. Perea*, 142 Ariz. 352, 354 (1984).  "[T]he initial step is to ascertain whether, in light of 'the objective circumstances of the interrogation,' a 'reasonable person [would] have felt he or she was not at liberty to terminate the interrogation and leave.'"  *Howes v. Fields*, 132 S. Ct. 1181, 1189 (2012) (citations omitted).  To determine how a suspect would have gauged his freedom to leave, "courts must examine '*all* of the circumstances surrounding the interrogation.'  Relevant factors include the location of the questioning, its duration, statements made during the interview, the presence or absence of physical restraints during the questioning, and the release of the interviewee at the end of the questioning."  *Id.* (citations omitted) (emphasis added).  In its analysis of Maciel's motion to suppress, the trial court and the majority examine three of these "relevant factors," but they give inadequate weight to the totality of the circumstances.

**¶42**      "[A]s the Arizona Supreme Court has recognized . . . when the on-the-scene questioning becomes accusatory in nature and when a reasonable man would feel he was deprived of his freedom of action in a significant way . . . *Miranda* warnings must be given."  *State v. Starr*, 119 Ariz. 472, 475 (App. 1978).  And "[i]n assessing whether a detention is too long in duration to be justified as an investigative stop, we consider it appropriate to examine whether the police diligently pursued a means of investigation that was *likely to confirm or dispel their suspicions quickly*, during

which time it was necessary to detain the defendant." *United States v. Sharpe*, 470 U.S. 675, 686 (1985) (emphasis added).

¶43    Here, Huntley initially detained Maciel and questioned him regarding his identity, searched him for weapons, and asked him if he was involved in removing the board from the window. This initial investigation produced no evidence that Maciel was involved in a crime and there was no basis upon which to further detain him. At this point, Huntley's detention of Maciel should have ended.

¶44    But the majority reasons:

> Once the officer observed evidence of a potential illegal entry, the building and the surrounding area became the scene of a criminal investigation over which he was in control. Rather than direct Maciel to leave the crime scene or allow him to continue to sit by the open window when an intruder might still be inside, the officer asked Maciel to sit in the patrol vehicle where the officer believed he would be safer.

I respectfully disagree with this analysis. If every building that might have experienced a broken window days earlier constituted a crime scene of which the police are "in control," then large areas of many communities in this state would perpetually be crime scenes under police control, and any passersby would automatically be subject to uncontrolled restraints on their freedom. The majority cites no authority for this sweeping proposition, and I cannot endorse it. The majority also apparently accepts Huntley's suggestion that he placed Maciel in the police cruiser for his safety. With due deference to the trial court's fact-finding role, there was simply no articulable danger to Maciel in these circumstances. The fact that an empty building may have had its window covering removed in the preceding 72 hours presented no clear and present threat to Maciel's safety. And while such acute vigilance in protecting citizens' safety from even inarticulable threats might be laudable in the abstract, that protective motive was tempered by the fact that Huntley was also encouraging a third party to pursue a speculative criminal complaint against the individual who was the focus of his care. Notably, the only other civilian at the scene, the pastor, was not asked to sit on the curb for "safety purposes" while another officer watched over him -- he was free to leave and did so.

¶45    In truth, police were not "diligently pursuing a means of investigation likely to confirm or dispel their suspicions quickly." This detention had far exceeded the time and scope of a general on-the-

scene investigation and moved into a custodial interrogation when Huntley initiated his second round of questioning. *See Zamora*, 220 Ariz. 63, 68, ¶ 10 (App. 2009) (defining custodial interrogation as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way" (citation omitted)).

¶46        A suspect's right not to incriminate himself does not come into existence only after he has expressed a desire not to have that right violated. "[U]nless other fully effective means are devised to inform accused persons of their right of silence and to assure a continuous opportunity to exercise it, the following measures are *required*. Prior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." *Miranda*, 384 U.S. at 444 (emphasis added). Nowhere in *Miranda* did the court hold that a suspect must object to his detention before these warnings must be given or that a suspect must express a desire to leave before he is considered to be in custody. Though a suspect's reaction to restraints on his liberty is a factor that may be relevant in a totality-of-the-circumstances analysis, it was hardly the most important factor in these circumstances. *Miranda* imposes on the police an obligation to provide warnings proactively -- the rule simply does not work if the suspect has any obligation to demand those warnings.

¶47        The totality of the circumstances make clear that a reasonable person would not have felt free to terminate the encounter with Huntley. Maciel, a homeless man, was detained by multiple officers with all of his possessions for at least an hour while multiple police officers arrived on the scene and asked him the same questions multiple times. For part of this time, he was placed in the back of a police car -- an environment from which no reasonable person would feel free simply to get out and leave. Then, a police officer was assigned to watch him while he sat on a curb, further enforcing the reasonable perception that he was not free to leave. During the second interrogation, Maciel was concededly in custody but was not given *Miranda* warnings until he had already made inculpatory statements. His statements should have been suppressed.

¶48        In *Seibert*, the court held that "the midstream recitation of [*Miranda*] warnings after interrogation and unwarned confession could not effectively comply with *Miranda*'s constitutional requirement," and therefore, "a statement repeated after a warning in such circumstances is inadmissible." 542 U.S. at 604. The court held that "unless the warnings

15

could place a suspect who has just been interrogated in a position to make [ ] an informed choice [to stop talking], there is no practical justification for accepting the formal warnings as compliance with *Miranda*, or for treating the second stage of interrogation as distinct from the first, unwarned and inadmissible segment." *Id.* at 612. The court further reasoned that, "[u]pon hearing warnings only in the aftermath of interrogation and just after making a confession, a suspect would hardly think he had a genuine right to remain silent, let alone persist in so believing once the police began to lead him over the same ground again. A more likely reaction on a suspect's part would be perplexity about the reason for discussing rights at that point, bewilderment being an unpromising frame of mind for knowledgeable decision." *Id.* at 613 (footnote omitted).

¶49        Under *Seibert*, the third interrogation (post-*Miranda*) could not sanitize the inculpatory statements that Maciel had already made, and all of the inculpatory statements should therefore have been suppressed.

¶50        For these reasons, I respectfully dissent.



Ruth A. Willingham · Clerk of the Court
F I L E D : ama